# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JANUARY 28, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JANUARY 28, 2021

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| KATHLEEN MANCINI, a single woman, | NO. 97583-3 |
| Petitioner, | EN BANC |
| v. | Filed: January 28, 2021 |
| CITY OF TACOMA, a municipal entity and political subdivision of the state of Washington; the TACOMA POLICE DEPARTMENT; and DON RAMSDELL, individually and in his official capacity as chief of Tacoma Police, | |
| Respondents. | |

GORDON McCLOUD, J.—On January 5, 2011, at 9:45 a.m., eight Tacoma police officers broke open the door of a Federal Way apartment with a battering ram. They had a search warrant, and they expected to find Matthew Logstrom, a young drug dealer living in a somewhat unkempt apartment. Instead, they awakened Kathleen Mancini: an older nurse living in a well-kept home, who had been sleeping after working the night shift. The police nevertheless handcuffed Mancini and took her, without shoes and wearing only a nightgown, outside while

*Mancini v. City of Tacoma et al.*, No. 97583-3

they searched. Mancini sued these police for negligence in the performance of their duties.

The Washington State Legislature has enacted a broad waiver of sovereign immunity. Consistent with that waiver, we hold that the standard tort duty of reasonable care applies with full force to police executing a search warrant. The jury found that the police breached that duty that they owed to Mancini and substantial evidence supports that verdict. We therefore reverse the Court of Appeals and reinstate the jury's verdict. We do not reach the question of whether police may separately be liable for the tort that the parties label "negligent investigation."

FACTS

I.    POLICE INVESTIGATION

A confidential informant (CI) advised Tacoma Police Officer Kenneth Smith that she had seen a dealer-sized quantity of drugs at Logstrom's apartment in Federal Way. 1 Verbatim Tr. of Proceedings (VTP) at 56. The CI identified one of four identical buildings and said she had seen those drugs in apartment B1. 3 VTP at 256. She was sure it was that building because Logstrom's car was in front of it. *Id.* The CI also told Officer Smith that Logstrom rented his apartment in his mother's name. 1 VTP at 53; 3 VTP at 255.

2

*Mancini v. City of Tacoma et al.*, No. 97583-3

Smith performed an online public record check of Logstrom and apartment B1. 3 VTP at 261-62. Specifically, Smith used "Accurint," a site that provides personal information for a fee.[1] 1 VTP at 51. Accurint produced 150 pages of information. 3 VTP at 308. From that information, Smith learned that Mancini resided at apartment B1 and that Logstrom was not associated with that apartment. 1 VTP at 51; 3 VTP at 262. Smith did not recall learning that Mancini had rented apartment B1 since 2006, that Mancini paid the utilities for apartment B1, that a Group Health landline was associated with apartment B1 for Mancini's work, or any details of the Accurint search beyond Mancini's age and race. 1 VTP at 51-54; 3 VTP at 306-08. Based on Mancini's age and race, Smith believed Mancini could be Logstrom's mother. 3 VTP at 262.

Smith testified that he ordinarily performed surveillance and conducted a controlled buy[2] in a target apartment in 95 percent of similar investigations. But he took neither step in this case. 1 VTP at 49-50. He provided numerous reasons for skipping these steps, including the limited relationship between the CI and

---

[1] Accurint provides information about utility bills, cable bills, loans, how long individuals have lived at a particular location, phone numbers, relatives, vehicles, evictions, criminal records, voter registration, driver's and professional license information, professional affiliations, concealed weapon permits, and neighbors. 1 VTP at 51; 3 VTP at 306-07.

[2] A "controlled buy" involves a CI making a drug purchase at the direction and control of police as part of an investigation. 2 VTP at 135. An expert witness testified that it is a "critical" investigative step. *Id.*

3

Logstrom, Smith's hesitance about interacting with the King County Prosecutor's Office, and limited officer availability due to the holidays and hunting season. 3 VTP at 278-79, 253.

Instead, Smith applied for a search warrant for apartment B1 with only the information he already possessed. Clerk's Papers (CP) at 177-78, 182-83. He attributed all the information about Logstrom to the CI's observations of Logstrom selling methamphetamine from both his apartment and his vehicle.[3] CP at 178. A judge issued a search warrant for Logstrom's person and vehicle, and for apartment B1. CP at 183-84.

II.     WARRANT EXECUTION

At about 9:45 a.m. on January 5, 2011, eight police officers arrived in a van to execute the warrant at apartment B1. 1 VTP at 57, 60. Police rated Logstrom a "medium threat" because he had been seen with a handgun in the past. 3 VTP at 285. An officer knocked on the door and announced their presence. *Id.* at 286. They received no response for 20 to 30 seconds. The police then broke open the door with a battering ram. They entered the apartment with guns drawn. 1 VTP at

---

[3] At trial, Smith clarified that the CI never told him she observed an actual drug deal; she merely observed a "dealer-sized quantity of drugs." 1 VTP at 56. Given the procedural posture of the case, we need not decide the impact of this clear misstatement in the warrant affidavit.

59-60; 3 VTP at 287; 4 VTP at 442-44.  Logstrom lived in apartment A1 in a

different building.

Mancini, the occupant of B1, was awakened by a "terrible shake and a loud

boom"; at first, she thought it was an earthquake.  4 VTP at 370.  She came out of

her bedroom in a nightgown to a "sea of black, men in black" with guns pointed at

her.  *Id.* at 371-72.  They screamed at her to get down and asked, "Where's Matt?"

and "Are you Kathleen?"  *Id.* at 371.  One officer pushed Mancini onto the floor

and cuffed her hands behind her back.  *Id.*  Police then "dragged" or "'passed'" her

outside of the apartment and denied her request to put on shoes.  *Id.* at 374.

Outside, an officer questioned Mancini about Logstrom.  *Id.* at 378-79.  The

officer took Mancini, still in a nightgown, handcuffed and unshod, up two flights

of stairs toward the parking lot and asked her about a vehicle that belonged to

Logstrom.  *Id.* at 379.  She told the officer it was associated with the neighboring

building.  *Id.*

Eventually, the police uncuffed Mancini and told her they had the wrong

apartment.  *Id.* at 386.  Mancini estimated she was cuffed for about 15 minutes.  *Id.*

at 393.  She acknowledged that she had given inconsistent accounts but clearly

stated that it "seemed like forever."  *Id.*

Smith testified that he knew immediately after entering that they had the

wrong apartment.  3 VTP at 236, 289-90; CP at 347.  Smith did not enter the

apartment until police had already taken Mancini into custody; he uncuffed her

after what he testified was 1 to 2 minutes. 3 VTP at 234-35. Other officers

estimated that the amount of time they spent at Mancini's apartment was between 2

and 8 minutes. 3 VTP at 296; 4 VTP at 349, 351. One officer testified that he

performed two "sweeps," which likely took 7.5 to 10 minutes, then he learned they

had the wrong apartment another 5 to 7 minutes later. 4 VTP at 453.

Eventually, the police left Mancini's apartment B1. They then approached

Logstrom's apartment A1. 3 VTP at 296. The police report omitted the time they

left Mancini and the time they first contacted Logstrom. *Id.* at 218, 237.

But the police had no warrant for apartment A1, so they "had to approach it

differently." 4 VTP at 352. The officers knocked on Logstrom's door, and he

came out. 3 VTP at 296; CP at 347. Logstrom then consented to a search, and the

officers found marijuana plants growing in his apartment. 3 VTP at 297; CP at

347. Unlike at Mancini's apartment, they did not use weapons or a battering ram.

CP at 347. Police seized drugs and other items from Logstrom's apartment and

took him to the station for questioning. They did not, however, detain him; they

released him pending further investigation. CP at 348.

### III.  LITIGATION

Mancini sued the city of Tacoma, the Tacoma Police Department, and the

chief of police (collectively City) for negligence, assault and battery, false

imprisonment, invasion of privacy, and several other torts. CP at 1, 4-8. As a

basis for her negligence claim, Mancini alleged that "actions on January 5, 2011 of

all the involved Tacoma Police officers fell below the standard of care in the

performance of their duties" and that "[a]s a proximate cause of the actions of the

Tacoma Police officers violently entering the wrong apartment[,] Kathleen

Mancini suffered injuries." CP at 4. She also alleged that "actions of Tacoma

Police officers on January 5, 2011 in 'capturing' and restraining Kathleen Mancini

fell below the standard of care in performance of their duties because they used

excessive force in restraining the plaintiff improperly and without cause." *Id.*

The City moved for summary judgment on each of Mancini's claims. CP at

201. The City argued that Mancini's negligence claim was for negligent police

investigation—a claim that, the City asserts, does not exist in Washington.[4] CP at

208-10. It also argued that in any event, the City had not breached any duty it

owed Mancini. CP at 210-12. The trial court granted the City's motion in full. CP

at 254-55.

Mancini appealed, and the Court of Appeals reversed. *Mancini v. City of

Tacoma*, No. 71044-3-I, slip op. at 11 (Wash. Ct. App. June 8, 2015) (unpublished)

(*Mancini* I), http://www.courts.wa.gov/opinions/pdf/710443.pdf. It held that

---

[4] The parties continue to dispute whether negligent investigation is a tort in Washington before this court.

7

Mancini had "a common law right in the sanctity of her home and that the City's agents had a duty not to engage in a nonconsensual invasion of her dwelling." *Id.* at 17. In a footnote, the Court of Appeals stated:

> The City attempts to reformulate Mancini's claim as being one for the nonexistent cause of action of negligent investigation. Mancini is correct in rejecting this reformulation. Mancini does not allege that a negligent investigation led to her being wrongly considered a suspect in a crime. Nor does she allege that a negligent investigation allowed the true criminal to cause her harm. The City's attempt to reformulate her claim is off the mark.

*Id.* at 18 n.12.

On remand, the case was tried to a jury on Mancini's negligence, invasion of privacy, false imprisonment, and assault and battery claims. CP at 526-29. Mancini presented evidence of the above facts.

Mancini also called expert witness Norm Stamper, former chief of the Seattle Police Department. Stamper criticized the police investigation and said there was "literally[] no excuse for hitting the wrong door." 2 VTP at 102. He testified that when police "hit[] the wrong door," "the effect is terrifying and traumatizing" to the occupants and is an experience "they'll never forget." *Id.* at 102-03. Stamper believed that the police "should have done different and more investigatory steps in investigating the crime at issue." 3 VTP at 202. But, as to the execution of the warrant, Stamper testified that ordering Mancini to the floor and placing her in handcuffs comported with proper protocol. 2 VTP at 175. He

opined that none of the tactics used by the officers amounted to excessive force and that none of the contact between the officers and Mancini was inappropriate. *Id.* at 175-76.

After Mancini rested, the City moved for a directed verdict pursuant to CR 50 on her negligence claim. 4 VTP at 486. The City argued that a claim for "negligent investigation against law enforcement" does not exist in Washington. *Id.* at 487. Mancini paradoxically responded both that she was not alleging negligent investigation and that "[t]here was virtually no police work done here. They put a drug informant in a car, drove her by four identical buildings and said, 'Point out which one is where you saw the drugs.' That was the extent of the investigation." *Id.* at 488. Relying on *Turngren v. King County*,[5] Mancini continued that the City was negligent in getting the wrong building and providing incomplete information to the magistrate, and that these problems invalidated the warrant. *Id.* at 489. She claimed that "if the officer had done any police work, whatsoever, it would not have happened. And not only did it happen, but then after he says he knows he's in the wrong apartment, it continues." *Id.*

---

[5] 104 Wn.2d 293, 705 P.2d 258 (1985).

The following day, the trial court ruled that the Court of Appeals had already

answered the negligent investigation issue in its first opinion and denied the City's

motion. 5 VTP at 517. The court ruled,

> False arrest and malicious prosecution is not really in play here, but the issue is of the negligence. The Court of Appeals talks about, in its footnote . . . , that negligent investigation is not relevant to this determination, which I know is in opposit[ion] to the city's position. That's what the Court of Appeals says. And for negligence, just like in *Bender*[6] and *Turngren*, what the proper procedure is, is to submit to the jury a *Bender* instruction.
>
> Again, this is in opposit[ion] to what I think makes a ton of sense, but that's what the case law says this is what probable cause is. . . . The motion to dismiss the negligence charge is denied.

*Id.*

Mancini's closing arguments emphasized negligence in the police

investigation. 7 VTP at 728 ("[T]heir idea of an investigation was to put this

woman in a van and drive her through the parking lot of a complex that had four

identical buildings. And she just points to an apartment and says, 'That's it.' And

that was pretty much the extent of their investigation."); CP at 564, 569 (Power

Point slide identifying the causes of action as "1. Negligence In Obtaining

Warrant[,] 2. Invasion of Privacy[,] 3. False Imprisonment[,] 4. Assault &

Battery").

---

[6] *Bender v. City of Seattle*, 99 Wn.2d 582, 664 P.2d 492 (1983).

10

*Mancini v. City of Tacoma et al.*, No. 97583-3

Mancini also listed each claim separately and stated the amount that each was worth. 7 VTP at 753-54. She sought a total of $454,200 in damages, $100,000 of which was for negligence. *Id.*

The jury instructions defined negligence generally as "the failure to exercise ordinary care" or the "doing of some act which a reasonably careful person would not do under the same or similar circumstances." CP at 510. The instructions did not specifically separate negligent investigation from negligent warrant execution.

The jury returned a separate verdict on each claim. It ruled for Mancini on her negligence claim, without specifying the facts on which they relied, and ruled against her on all of her other claims. CP at 526-29. The jury found that the City's negligence proximately caused Mancini's injuries and that her damages totaled $250,000. CP at 526.

The City appealed the denial of its CR 50 motion. The Court of Appeals reversed in an unpublished opinion. *Mancini v. City of Tacoma*, No. 77531-6-I, slip op. at 17 (Wash. Ct. App. May 13, 2019) (unpublished) (*Mancini* II), http://www.courts.wa.gov/opinions/pdf/775316.pdf. Though *Mancini* I had rejected the City's arguments that Mancini's negligence claim was for "negligent investigation," *Mancini* II held that "the evidence adduced at trial established that Mancini's negligence claim, as tried, was a claim for negligent investigation," which is not cognizable in Washington. *Id.* at 7. The Court of Appeals opined that

11

any evidence of police wrongdoing "during and after the entry" to Mancini's apartment was relevant only to her intentional tort claims, not to her negligence claim. *Id.* at 7 n.7. The Court of Appeals explained that Mancini's arguments in response to the City's CR 50 motion "ma[de] it plain that her claim, as tried, had become one concerning negligence in the evidence gathering aspects of Officer Smith's investigation." *Id.* at 10. We granted review, 194 Wn.2d 1009 (2019), and now reverse.

ANALYSIS

I.     WE MUST UPHOLD THE JURY'S VERDICT IF IT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The City appealed from the trial court's denial of its CR 50 motion for a directed verdict. A trial court should grant such a motion only when a party has been fully heard on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found" for that party on that issue. CR 50(a)(1). A motion for directed verdict "should be granted only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party." *H.B.H. v. State*, 192 Wn.2d 154, 162, 429 P.3d 484 (2018) (citing *Goodman v. Goodman*, 128 Wn.2d 366, 371, 907 P.2d 290 (1995)). "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" *Delgado Guijosa v. Wal-Mart Stores, Inc.*,

12

*Mancini v. City of Tacoma et al.*, No. 97583-3

144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting *Brown v. Superior Underwriters*, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)). "The evidence must be considered in the light most favorable to the nonmoving party." *Bender*, 99 Wn.2d at 587 (citing *Bertsch v. Brewer*, 97 Wn.2d 83, 90, 640 P.2d 711 (1982); *Reiboldt v. Bedient*, 17 Wn. App. 339, 344, 562 P.2d 991 (1977)).

We review a trial court's decision on a CR 50 motion as a matter of law and "apply the same standard as the trial court." *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007) (per curiam) (citing *Hizey v. Carpenter*, 119 Wn.2d 251, 271, 830 P.2d 646 (1992)). We may affirm the trial court's decision "on any ground supported by the record." *Washburn v. City of Federal Way*, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013) (citing *Mountain Park Homeowners Ass'n, Inc. v. Tydings*, 125 Wn.2d 337, 344, 883 P.2d 1383 (1994); *Rawlins v. Nelson*, 38 Wn.2d 570, 578, 231 P.2d 281 (1951)).

The parties dispute whether Mancini's negligence claim was for "negligent investigation" and, if so, whether such a tort exists in Washington. But Mancini did not allege negligent investigation in her complaint. The trial court did not instruct the jury on negligent investigation. And the jury did not return a special verdict finding negligent investigation.

Instead, Mancini pleaded that the police actions in "'capturing' and restraining" her fell below the standard of care and that the police were negligent

13

in the "performance of their duties," in general, on the date of the raid. CP at 4.

Such a general allegation of negligence is sufficient to "give the defendant notice

that all elements of the claim might be explored during the trial." *Callahan v.*

*Keystone Fireworks Mfg. Co.*, 72 Wn.2d 823, 826, 435 P.2d 626 (1967) (declining

to require plaintiff to plead a breach of a particular duty to warn). Consistent with

Mancini's general negligence claim, the court instructed the jury that

> [n]egligence is the failure to exercise ordinary care. It is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances.

CP at 510. The jury then returned a verdict finding for Mancini on her negligence

claim. CP at 526.

To be sure, Mancini emphasized the inadequacy of the police investigation

throughout the trial, just as she did in response to the City's legal arguments. As a

result, the Court of Appeals ruled that the only negligence Mancini argued at trial

concerned the police investigation.

But, as the jury was instructed, a party's arguments are not evidence. *In re*

*Pers. Restraint of Phelps*, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018); CP at 502.

Instead, a CR 50 motion must be denied if substantial evidence exists in the record

to sustain the jury's verdict. Despite Mancini's decision to emphasize negligent

investigation in her trial presentation, we must examine the record for substantial

14

*Mancini v. City of Tacoma et al.*, No. 97583-3

evidence of any negligence. As explained below, the record contains such

evidence. The trial court therefore correctly denied the City's CR 50 motion. No

analysis into whether Mancini could or could not recover for negligent police

investigation is necessary to resolve this case.[7]

II.     POLICE OWE AN ORDINARY DUTY OF REASONABLE CARE WHEN CARRYING
         OUT THEIR OFFICIAL DUTIES

"To prevail on a negligence claim, a plaintiff "'must show (1) the existence

of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the

breach as the proximate cause of the injury.'"" *Ehrhart v. King County*, 195

Wn.2d 388, 396, 460 P.3d 612 (2020) (quoting *N.L. v. Bethel Sch. Dist.*, 186

Wn.2d 422, 429, 378 P.3d 162 (2016) (quoting *Crowe v. Gaston*, 134 Wn.2d 509,

---

[7] To be sure, the Court of Appeals has repeatedly denied recovery for negligent police investigation. *See, e.g.*, *Donaldson v. City of Seattle*, 65 Wn. App. 661, 671, 831 P.2d 1098 (1992) ("Washington does not recognize the tort of negligent investigation."); *Corbally v. Kennewick Sch. Dist.*, 94 Wn. App. 736, 740, 973 P.2d 1074 (1999) ("In general, a claim for negligent investigation is not cognizable under Washington law." (citing *Fondren v. Klickitat County*, 79 Wn. App. 850, 862, 905 P.2d 928 (1995))); *Lesley v. Dep't of Soc. & Health Servs.*, 83 Wn. App. 263, 273, 921 P.2d 1066 (1996) ("Washington courts have not recognized a cause of action for negligent investigation in some other contexts [besides *Babcock v. State*, 116 Wn.2d 596, 620, 809 P.2d 143 (1991)]."); *Laymon v. Dep't of Nat. Res.*, 99 Wn. App. 518, 530, 994 P.2d 232 (2000) ("A claim of negligent investigation will not lie against police officers." (citing *Fondren*, 79 Wn. App. at 862)); *Janaszak v. State*, 173 Wn. App. 703, 725, 297 P.3d 723 (2013). We have frequently dismissed the idea of common law negligent investigation claims and recognized child abuse investigations as an "exception" to this rule. *See Wrigley v. Dep't of Soc. & Health Servs.* , 195 Wn.2d 65, 76, 455 P.3d 1138 (2020); *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 702, 222 P.3d 785 (2009); *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 601, 70 P.3d 954 (2003). But we have never addressed an actual negligent investigation claim outside the child abuse context.

15

514, 951 P.2d 1118 (1998))). At issue in this case is the first element: whether police owe a duty of reasonable care in the exercise of their official duties.

We have already answered this question. "At common law, every individual owes a duty of reasonable care to refrain from causing foreseeable harm in interactions with others." *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550, 442 P.3d 608 (2019). "This duty applies in the context of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance." *Id.*

Indeed, "[c]laims of negligent law enforcement are not novel. Washington courts have long recognized the potential for tort liability based on the negligent performance of law enforcement activities." *Id.* at 543. "[A]s in the case of a private defendant charged with negligence, the determination whether a municipality has exercised reasonable care 'must in each case necessarily depend upon the surrounding circumstances.'" *Bodin v. City of Stanwood*, 130 Wn.2d 726, 734, 927 P.2d 240 (1996) (quoting *Berglund v. Spokane County*, 4 Wn.2d 309, 316, 103 P.2d 355 (1940)).

We have not, however, specifically addressed tort liability for negligence in the execution of a search warrant. Today we hold that police executing a search

warrant owe the same duty of reasonable care that they owe when discharging

other duties.[8]

Our holding is compelled by several prior decisions. We have recognized a

*trespass* claim for "unnecessary damage to property caused by . . . law

enforcement officers executing a search warrant." *Brutsche v. City of Kent*, 164

Wn.2d 664, 671, 193 P.3d 110 (2008); *see also Goldsby v. Stewart*, 158 Wash. 39,

41, 290 P. 422 (1930) ("In executing a search warrant, officers of the law should

do no unnecessary damage to the property to be examined."). Although Brutsche

sued the City of Kent for both trespass and negligence, we ruled only on his

trespass claim because the alleged misconduct had been intentional. 164 Wn.2d at

674. We affirmed the summary dismissal of Brutsche's trespass claim because the

officers' entry was supported by a valid warrant and, critically, because "[t]he

---

[8] *See, e.g.*, *Beltran-Serrano*, 193 Wn.2d at 540 (negligent escalation of encounter); *Washburn*, 178 Wn.2d at 752 (negligent service of domestic violence antiharassment order); *Stalter v. State*, 151 Wn.2d 148, 160, 86 P.3d 1159 (2004) (negligent failure to release wrong suspect); *Chambers-Castanes v. King County*, 100 Wn.2d 275, 277, 669 P.2d 451 (1983) (negligent emergency response); *Mason v. Bitton*, 85 Wn.2d 321, 327, 534 P.2d 1360 (1975) (negligent high-speed chase in pursuit of suspect). The dissent cites an older line of cases that implies a special standard of care based on the "reasonably prudent police officer" should apply. Dissent at 4-5 (citing *Estes v. Brewster Cigar Co.*, 156 Wash. 465, 287 P. 36 (1930); *Reese v. City of Seattle*, 81 Wn.2d 374, 503 P.2d 64 (1972)); *see also Coldeen v. Reid*, 107 Wash. 508, 182 P. 599 (1919). To the extent these cases stand in tension with our more recent precedent confirming that officers must comply with the ordinary "duty of reasonable care to refrain from causing foreseeable harm in interactions with others," *Beltran-Serrano*, 193 Wn.2d at 550, we disavow them.

officers did not engage in unreasonable conduct in exercising their privilege to be on the property." *Id*. at 679.

*Brutsche* thus reiterated the holding of *Goldsby* on which it relied: officers who enter private property, even with a valid warrant, owe occupants a duty to refrain from unreasonable conduct while on that property. *Id.* at 675. *Brutsche* further explained that officers can be liable for breaching that duty of reasonable care because "by executing the warrant *in a negligent manner* and thereby damaging the property, law enforcement officers exceed the scope of their privilege to be on the land to execute a search warrant." *Id.* at 685 (emphasis added).

To be sure, *Brutsche* also stated that in such cases, the misconduct may "be either intentional or negligent misconduct, but the action itself is a trespass action." *Id.* at 674 (citing RESTATEMENT (SECOND) OF TORTS § 214(1) cmt. a (AM. LAW INST. 1965)). But, because *Brutsche* relied exclusively on a single trespass case and because "the actions of the officers in breaching the doors on Brutsche's property were intentional, not accidental," we declined to make any holding on Brutsche's negligence claim. *Id.* at 679. Unlike *Brutsche*, Mancini relies on negligence precedent. She also alleged negligent conduct that might fall outside the tort of trespass, such as the officers' unreasonable failure to see they were in the wrong apartment and their failure to release her and depart after realizing their

mistake.  Also unlike the plaintiff in *Brutsche*, Mancini did not limit her claimed

damages to her property.  The *Brutsche* decision therefore provides limited

guidance on the scope of the duty of reasonable care in the warrant execution

context, other than to acknowledge that such a duty of reasonable care exists under

the tort of trespass.

Since *Brutsche*, we have also clarified that the availability of "a valid

intentional tort claim for excessive force has no bearing on the viability of" a

negligence claim.  *Beltran-Serrano*, 193 Wn.2d at 547.  Specifically, in *Beltran-*

*Serrano*, we held that the city could be liable for negligence that caused the

plaintiff harm even where the subsequent harm was essentially a separate

intentional tort *by the same tortfeasor*.  *Id.* at 544-45.  Such negligence claims

require the jury to consider "the totality of the circumstances involved in the

encounter" between police and the plaintiff and any negligent acts of police

throughout that interaction.  *Id.* at 545.

Further, our decision in *Stalter v. State*, 151 Wn.2d 148, 86 P.3d 1159

(2004), addressed the scope of the duty to release the wrong suspect.  In *Stalter*,

two plaintiffs brought separate false imprisonment and negligence claims against

Pierce County for continuing to detain them in the Pierce County Jail after being

put on notice that the police were holding the wrong person.  *Id.* at 151-53.  The

*Stalter* negligence claims are similar in that respect to Mancini's negligence claim,

19

*Mancini v. City of Tacoma et al.*, No. 97583-3

given that all are based—at least in part—on negligent detention. In *Stalter*, we explained that the availability of both false imprisonment and negligence claims depended on the same thing: whether the county owed the plaintiff a duty of care to avoid detaining him due to misidentification. *Id.* at 155. We held that the answer was yes—"jailers have a duty to take steps to release a detainee once they know or should know that confinement of the detainee is unwarranted." *Id.* at 156 (citing *Tufte v. City of Tacoma*, 71 Wn.2d 866, 870, 431 P.2d 183 (1967)). And because the county had such a duty, we ruled that the trial courts erred in dismissing the claims and remanded for trial on both negligence and false imprisonment claims.[9] *Id.*

Mancini sued for false imprisonment, assault and battery, and invasion of privacy. Under *Brutsche*, *Stalter*, and *Beltran-Serrano*, she may raise a claim of

---

[9] Relatedly, federal courts have also allowed similar claims of illegal detention to proceed under 42 U.S.C. § 1983 where the officers raided the wrong home and stayed for an unreasonable period of time. *See, e.g.*, *Simmons v. City of Paris*, 378 F.3d 476, 480-81 (5th Cir. 2004) (denying qualified immunity and finding factual dispute where plaintiffs "offered evidence that defendants did not immediately depart after learning that they were in the wrong house," instead remaining for five to six minutes and continuing to search); *Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir. 1995) (finding a genuine issue of material fact as to "at what point the officers knew or reasonably should have known they were at the wrong residence," and that the trier of fact must determine "what searches and seizures occurred after that" where plaintiffs alleged officers had remained in the wrong residence to "secure" it "for an additional four to five minutes" rather than exiting promptly).

20

*Mancini v. City of Tacoma et al.*, No. 97583-3

negligent execution of the search warrant, and she may base it on the officers' duty

to exercise reasonable care in executing the warrant and in detaining her.[10]

III.     NEITHER SOVEREIGN IMMUNITY NOR THE PUBLIC DUTY DOCTRINE PRECLUDE
         MANCINI'S CLAIM

The scope of government tort liability certainly has limits, as the parties

discuss.  But neither sovereign immunity nor the public duty doctrine bar Mancini

from recovering for negligent warrant execution in this case.

A.  DISCRETIONARY GOVERNMENTAL IMMUNITY DOES NOT BAR MANCINI'S
    CLAIM

"Since the Washington State Legislature waived sovereign immunity for

municipalities in 1967, municipalities are generally held to the same negligence

standards as private parties."  *Keller v. City of Spokane*, 146 Wn.2d 237, 242-43,

44 P.3d 845 (2002) (internal citation and footnote omitted) (citing *Bodin*, 130

---

[10] Some federal courts have also recognized a duty to exercise reasonable care in the execution of a search warrant.  *See, e.g.*, *Alonzo v. United States*, 2017 WL 1483366 at *6 (D.N.H. 2017) (denying government's motion to dismiss negligence claim brought under Federal Tort Claims Act for DEA (United States Drug Enforcement Agency) officer's actions, after entering suspected drug house pursuant to a warrant, in accidentally shooting and severely injuring a bystander female "standing in the hall with her young grandchild"; government owed a duty of care analogous to that of private citizen who owns guns and is required to use due care); *Goehring v. United States*, 870 F. Supp. 106, 107-09 (D. Md. 1994) (government agent not entitled to qualified immunity for planning and execution of search warrant because "it cannot be said that viewing the facts most favorably to plaintiff, a reasonable officer standing in the shoes of [the agent] could have believed that shooting plaintiff was objectively reasonable" where, upon police entry, plaintiff "dropp[ed] to his knees behind the counter. . . . Fortunately plaintiff raised his hands instead of his head.  Empty and with palms outstretched, the hands became [the agent's] target")).

21

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Mancini v. City of Tacoma et al.*, No. 97583-3

Wn.2d at 731); *see* RCW 4.96.010. However, since that waiver, we have created "the very narrow exception of discretionary governmental immunity" to "prevent the courts from passing judgment on basic policy decisions that have been committed to coordinate branches of government." *Bender*, 99 Wn.2d at 587-88 (citing *Evangelical United Brethren Church of Adna v. State*, 67 Wn.2d 246, 407 P.2d 440 (1965)).

That immunity, however, is limited to high level policy decisions, as *Bender* explains. In *Bender*, police relied on a bad tip to execute a search warrant and place Bender in custody. *Id.* at 585-86. Bender's subsequent police misconduct lawsuit alleged that "a full disclosure of all known information and a proper investigation by the police would have persuaded the prosecution not to file criminal charges because of a lack of probable cause." *Id.* at 586. The City argued it was immune from tort liability because the police conduct at issue consisted of "high level discretionary acts." *Id.* at 587.

We disagreed. In ruling that the officers in *Bender* could not rely on discretionary governmental immunity, we overturned two Court of Appeals decisions and held:

> Although police investigations and the disclosure of investigation information to the press are of a discretionary nature, we do not view those actions as the type of *high level, policymaking decisions of a governmental entity* that fall within the rule of discretionary governmental immunity. Instead, such conduct is more closely

22

*Mancini v. City of Tacoma et al.*, No. 97583-3

> analogous to the type of discretion exercised at an everyday operational level, such as whether or not to engage in a high speed chase.

*Id.* at 589-90 (emphasis added) (citing *Mason v. Bitton*, 85 Wn.2d 321, 328-29, 534 P.2d 1360 (1975) (finding no discretionary immunity for decision to engage in high-speed car chase)). In fact, we explained that tort liability "may be the only way of assuring a certain standard of performance from governmental entities." *Id.* at 590.

Thus, following *Bender*, police lack discretionary governmental immunity for their investigative and other "everyday operational level" acts. The City appropriately concedes that "[t]his case does not involve a policy decision made by a coordinate branch of government, and thus the doctrine of discretionary immunity has no bearing on it." City of Tacoma's Answer to Br. of Amicus Curiae Am. Civil Liberties Union of Wash. at 8.[11]

## B. THE PUBLIC DUTY DOCTRINE DOES NOT BAR MANCINI'S CLAIM

"To establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public." *Beltran-Serrano*, 193 Wn.2d at 549 (citing

---

[11] Even if the officers in this case could claim some form of immunity, "[a]n agent's immunity from civil liability generally does not establish a defense for the principal." *Babcock*, 116 Wn.2d at 620 (citing RESTATEMENT (SECOND) OF AGENCY § 217 (AM. LAW INST. 1958)). The city of Tacoma as principal would not be able to claim any immunity claimed by the individual officers involved in executing the search warrant.

23

*Mancini v. City of Tacoma et al.*, No. 97583-3

*Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 785, 30 P.3d 1261

(2001) (plurality opinion)).  The public duty doctrine serves as a "focusing tool

used to determine whether" a defendant government owes "'a duty to a "nebulous

public" or a particular individual.'"  *Munich v. Skagit Emergency Commc'ns Ctr.*,

175 Wn.2d 871, 878, 288 P.3d 328 (2012) (quoting *Osborn v. Mason County*, 157

Wn.2d 18, 27, 134 P.3d 197 (2006) (quoting *Taylor v. Stevens County*, 111 Wn.2d

159, 166, 759 P.2d 447 (1988))).

　　　As the Court of Appeals held in *Mancini* I, this is not a case where the City's

duty ran solely to the public at large.  Our decisions recognize a difference in the

public duty doctrine context between "misfeasance" and "nonfeasance."  *Robb v.*

*City of Seattle*, 176 Wn.2d 427, 439, 295 P.3d 212 (2013).  Unlike government

actors in many public duty doctrine cases who fail to protect a plaintiff from harm

caused by a third party or entity, *see, e.g.*, *id.*; *Munich*, 175 Wn.2d at 874; *Ehrhart*,

195 Wn.2d at 391-92, the police in this case personally caused the harm of which

Mancini complains.  In such a case of affirmative misfeasance, all individuals have

a duty to exercise reasonable care—including when they invade another's property.

　　　For example, in *Beltran-Serrano*, we held that police, just like other people,

must exercise ordinary reasonable care "to refrain from causing foreseeable harm

in interactions with others."  193 Wn.2d at 550.  This duty "applies in the context

24

*Mancini v. City of Tacoma et al.*, No. 97583-3

of law enforcement and encompasses the duty to refrain from directly causing harm to another through affirmative acts of misfeasance." *Id.*

The officers executing the search warrant at Mancini's apartment were bound by a duty to exercise reasonable care. This was not an abstract duty to the nebulous public, but a specific duty enforceable by Mancini in tort. The public duty doctrine does not apply.

IV.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING OF NEGLIGENCE

We have so far determined that police owe a duty of reasonable care when they execute a search warrant. We must affirm the jury's verdict if substantial evidence supports its decision that the police breached that duty. We therefore review the record to determine whether it contains such evidence. Substantial evidence exists "'if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" *Guijosa*, 144 Wn.2d at 915 (quoting *Brown*, 30 Wn. App. at 306).

At trial, Mancini introduced evidence that the police raided her apartment, pointed guns at her, forced her to the ground, handcuffed her, took her outside barefoot in a nightgown, in January, and left her handcuffed for up to 15 minutes. She also presented contrasting evidence of the peaceful manner by which police contacted Logstrom's actual apartment, despite justifying their initial raid by rating Logstrom a potentially armed "medium threat." The evidence, taken in the light

25

*Mancini v. City of Tacoma et al.*, No. 97583-3

most favorable to Mancini, offered the jury multiple avenues to find that police

breached their duty of care. A rational juror could have found that police breached

the door unreasonably quickly after knocking and receiving no response,[12] that

police took an unreasonable amount of time to realize they had the wrong

apartment, that the police unreasonably continued their search of Mancini's

apartment after realizing they had hit the wrong door, or that the police

unreasonably left Mancini handcuffed long after realizing she had no relation to

their suspect—or any combination of these facts. Given the general claim of

negligence and the general verdict form on this claim, any of the above would

support the trial court's decision.

There was certainly evidence that contradicted Mancini's story. *See, e.g.*, 2

VTP at 175-76 (testimony that police tactics were reasonable). But the jury is the

---

[12] In the criminal context, "[w]hether an officer waited a reasonable time before entering a residence is a factual determination . . . and depends upon the circumstances of the case." *State v. Richards*, 136 Wn.2d 361, 374, 962 P.2d 118 (1998) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997)). Police must wait long enough to serve the purposes of the "knock and announce" rule, which include "(1) reduction of potential violence to both occupants and police arising from an unannounced entry, (2) prevention of unnecessary property damage, and (3) protection of an occupant's right to privacy." *State v. Coyle*, 95 Wn.2d 1, 5, 621 P.2d 1256 (1980). What constitutes a reasonable waiting period depends on the facts of the particular case, but the Court of Appeals has found 6 to 9 seconds insufficient where police knocked at hours when occupants would likely be asleep. *State v. Ortiz*, 196 Wn. App. 301, 309, 383 P.3d 586 (2016). A reasonable jury could have concluded that 20 to 30 seconds in the context of this case was unreasonable. *See* 4 VTP at 442.

sole judge of the credibility of witnesses, *Scribner v. Nat'l Ref. Co.*, 169 Wash. 44, 47, 13 P.2d 61 (1932), and whether the overall conduct of the police was reasonable was an ultimate fact to be decided by the jury.[13]

It is also certainly true that Mancini argued her case to the jury as a negligent investigation case, not a negligent warrant execution case. This was true of both her legal arguments in response to the City's CR 50 motion and her arguments and slide show to the jury in closing. But arguments are not evidence. *Phelps*, 190 Wn.2d at 172. When reviewing a CR 50 motion, we must affirm the jury's verdict if substantial evidence supports it. *H.B.H.*, 192 Wn.2d at 162. Where a general verdict makes it "impossible to know whether the jury found liability" on either of two possible theories, we decline to "dissect the jury's general verdict" and, instead, we let it stand. *McCluskey v. Handorff-Sherman*, 125 Wn.2d 1, 11, 882

---

[13] The dissent is correct that expert testimony is admissible to help the jury assess the reasonableness of police conduct. Stamper's testimony was properly admitted in this case. But "[a]s a general proposition, expert testimony is not required to establish a standard of care in an action for negligence. Only in a professional malpractice action must a plaintiff introduce expert testimony to establish the standard of care by which the defendant's conduct must be measured." *Petersen v. State*, 100 Wn.2d 421, 437, 671 P.2d 230 (1983) (internal citation omitted). The dissent does not show that we should, for the first time, *require* this type of expert testimony to establish a professional malpractice standard of care for police officers. *See, e.g.*, *Washburn*, 178 Wn.2d at 754-59 (city owed defendant both statutory duty of care to serve antiharassment order and ordinary duty of care under restatement to act reasonably—neither of which required expert testimony about the proper standard). Juries are capable of determining whether police conduct was reasonable. *See Bender*, 99 Wn.2d at 597 (holding juries capable of applying objective probable cause standard).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Mancini v. City of Tacoma et al.*, No. 97583-3

P.2d 157 (1994). Substantial evidence supported the jury's negligence verdict in this case.

CONCLUSION

We hold that police owe a duty to exercise reasonable care when executing a search warrant. We further hold that substantial evidence exists from which a reasonable jury could conclude that Tacoma police breached that duty in entering, searching, and detaining at Mancini's apartment. Accordingly, we reverse the Court of Appeals and reinstate the trial court's denial of the City's CR 50 motion.

_____
Gordon McCloud, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____

_____
Owens, J.

_____
Stephens, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.

*Mancini v. City of Tacoma, et al.*

No. 97583-3

MADSEN, J. (dissenting)—I am sympathetic with the majority's desire to provide compensation for the ordeal that Kathleen Mancini went through because of the poorly conducted police investigation in this case. However, the proper approach would be to recognize a cause of action for negligent police investigation. Because the majority does not do so (though I would), and because Mancini failed to show the police acted negligently in the actual execution of the warrant, I cannot join the majority. For the reasons explained below, I would affirm the Court of Appeals' decision that the trial court erred in denying the City of Tacoma's motion for judgment as a matter of law as to Mancini's negligence claim.

At trial, Mancini put forth, and presented evidence on, two theories concerning her negligence claim: negligent investigation and negligent actions of police in executing the search warrant.[1] But her evidence and her argument focused on negligent investigation.

---

[1] In closing argument, Mancini contended that "Tacoma police did not do their homework." 7 Verbatim Tr. of Proceeding at 722-23. That is, they negligently investigated the matter. In her complaint, Mancini alleged that as to her assertion of negligence, the actions of Tacoma police officers on January 5, 2011, while acting within the course and scope of their employment and authority, "fell below the standard of care in performance of their duties." Clerk's Papers at 4.

No. 97583-3
Madsen, J., dissenting

Mancini's expert, a former chief with the Seattle Police Department, testified that the

Tacoma Police Department's "investigation was woefully inadequate." 3 Verbatim Tr. of

Proceeding (VTP) at 208. The expert opined, "[T]here is no excuse . . . for hitting the

wrong door." 2 VTP at 102. The expert agreed with the statement that Tacoma police

"should have done different and more investigatory steps in investigating the crime." 3

VTP at 202.

But as to the execution of the search warrant and police contacts with Mancini, the

expert testified that Tacoma police acted appropriately. Mancini's expert confirmed that

officers properly employed knock-and-announce procedures; that is, officers knocked on

the apartment door, announced that they were police with a warrant, and waited 20 to 30

seconds before entering. The expert confirmed that "if there has been no answer,

prevailing police practices and procedures dictate that they breach the door and gain entry

to the apartment." 2 VTP at 174. The expert confirmed that such procedures are "for

everyone's safety." *Id.* The expert confirmed that "part of keeping everyone safe is for

law enforcement to utilize well-established procedures that allow them to quickly gain

control of the situation" and that "the tactics that were used to execute the warrant in this

case were proper." *Id.*

Under questioning, Mancini's expert further confirmed that when executing the

search warrant in this circumstance, officers ordering (and even, in some circumstances,

---

And specifically, that the actions of Tacoma police officers "in 'capturing' and restraining
Kathleen Mancini fell below the standard of care in performance of their duties because they
used excessive force in restraining the plaintiff improperly and without cause." *Id.*

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 97583-3
Madsen, J., dissenting

pushing) to the floor a subject found in the apartment and placing the subject in handcuffs is proper procedure. *Id.* at 175. The expert explained that as to the search warrant execution, "none of the tactics used by the officers were excessive with respect to the amount of force." *Id.* The expert reviewed Mancini's deposition, which contained descriptions of the contacts that Mancini had with the police officers executing the search warrant, and opined that "none of those [police contacts] appeared to be inappropriate." *Id.* at 176.

In light of this evidence—from Mancini's own expert—and as further explained below, I would affirm the Court of Appeals. First, in my view, because police are highly trained professionals, expert testimony on the standard of care to be employed by such professionals was appropriate in this case. *See State v. Jones*, 59 Wn. App. 744, 750, 801 P.2d 263 (1990) ("The basic approach of the current rules of evidence is to admit expert opinions when helpful to the trier of fact. ER 702."). "Generally, expert evidence is helpful and appropriate when the testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party." *Id.* Specifically, "[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996); *see also* MICHAEL AVERY ET AL., POLICE MISCONDUCT: LAW AND LITIGATION § 11:15, at 801-02 (3d ed. 2015) ("[Expert] testimony is routinely employed in cases involving municipal or supervisory liability . . .

3

proper police procedures and tactics with respect to use of force, whether given use of force was 'excessive,' the use of canines, the use of police equipment, proper police procedure and tactics in approaching suspects, *proper investigative techniques*, and the code of silence." (emphasis added) (footnotes omitted)).  Execution of a search warrant—similar to drug dealing, police interrogations, and handling of exculpatory material—is outside the knowledge of an average juror.  *See Thomas*, 74 F.3d at 682; AVERY, *supra*, at 803 n.25 (listing a broad range of cases from around the United States in which expert testimony has been held appropriate).

Citing *Beltran-Serrano*, the majority concludes that the appropriate standard in a police negligence action is reasonable care.  *See* majority at 16 (quoting *Beltran-Serrano v. City of Tacoma*, 193 Wn.2d 537, 550, 442 P.3d 608 (2019)).  *Beltran-Serrano* noted that at common law, individuals owe a duty of reasonable care to refrain from causing foreseeable harm, and this duty applies to law enforcement officers' duty to "refrain from directly causing harm to another through affirmative acts of misfeasance."  193 Wn.2d at 550 (citing *Robb v. City of Seattle*, 176 Wn.2d 427, 295 P.3d 212 (2013); *Coffel v. Clallam County*, 47 Wn. App. 397, 403, 735 P.2d 686 (1987)).  *Beltran-Serrano* and the cases on which it relies accepted, but did not *hold*, that the reasonable person standard applies.  *See id.*  Here, we may opine on whether that standard is indeed correct.

Expert testimony has been used to establish a standard of care in police negligence actions.  For example, in *Estes v. Brewster Cigar Co.*, an officer pursued a plaintiff under the mistaken belief that the plaintiff had committed a felony; in so doing, the police used

No. 97583-3
Madsen, J., dissenting

deadly force to shoot and wound the plaintiff. 156 Wash. 465, 467, 287 P. 36 (1930).

The *Estes* court explained that a police officer has "training and experience" that renders

him or her more observant and quicker to sense an emergency situation than an ordinary

person. *Id*. at 472. *Estes* states that the applicable standard of care is that of a reasonably

prudent police officer. *Id*. at 471-72; *see also Reese v. City of Seattle*, 81 Wn.2d 374,

382, 503 P.2d 64 (1972) (reiterating *Estes*'s "reasonably prudent police officer"

standard). Yet the majority disavows *Estes* because it stands in tension with other cases

indicating the applicable standard is a reasonable person. *See* majority at 17 n.8. I

disagree.

I would hold that police officers are professionals just as engineers and attorneys

are, and they must be held to the standard of care for their profession. *See Michaels v.

CH2M Hill, Inc.*, 171 Wn.2d 587, 609, 257 P.3d 532 (2011); *McKee v. Am. Home Prods.,

Corp.*, 113 Wn.2d 701, 706-07, 782 P.2d 1045 (1989) ("The duty of physicians must be

set forth by a physician, the duty of structural engineers by a structural engineer and that

of any expert must be proven by one practicing in the same field—by one's peer."). The

*Restatement (Second) of Torts* states the familiar standard of care for professionals:

"[O]ne who undertakes to render services in the practice of a profession or trade is

required to exercise the skill and knowledge normally possessed by members of that

profession or trade in good standing in similar communities." RESTATEMENT (SECOND)

OF TORTS § 299A (AM. LAW INST.1965).

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 97583-3
Madsen, J., dissenting

This court has recognized that a plaintiff must introduce expert testimony to establish the standard of care by which the defendant's conduct must be measured. *Petersen v. State*, 100 Wn.2d 421, 437, 671 P.2d 230 (1983). Other courts have held similarly. In a claim of negligence against a doctor, lawyer, or other specialized professional, "a plaintiff must present expert testimony establishing the applicable standard of care unless common knowledge warrants an inference of negligence." *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982); *see also Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C. 1991) ("[w]here . . . the subject presented is so distinctly related to some science, profession, or occupation, as to be beyond the ken of a lay juror, the plaintiff must prove the applicable standard of care"); *but see Petersen*, 100 Wn.2d at 437 ("[E]xpert testimony is not required if the practice of a professional is such a gross deviation from ordinary care that a lay person could easily recognize it."). Here, the subject of the negligence action is so distinctly related to the law enforcement profession and beyond the common knowledge of the average juror that the applicable standard of care for police investigation must be proved with expert testimony. *Jones*, 59 Wn. App. at 750; *Levy*, 584 A.2d at 1255; *see also Zieger v. City of Seattle*, No. 79394-2-I, slip op. at 7-8 (Wash. Ct. App. June 29, 2020) (unpublished), http://www.courts.wa.gov/opinions/pdf/793942.pdf (holding that the outfitting of police officers on bicycles for riot conditions is not something commonly understood by a lay person).

6

No. 97583-3
Madsen, J., dissenting

Because the present case is the first opportunity for this court to expressly review

the standard of care in police negligence actions, our sister courts provide helpful

guidance.  Courts from around the United States have looked to the District of Columbia

for guidance on standards of care in police negligence.  *E.g.*, *Niebur v. Town of Cicero*,

136 F. Supp. 2d 915, 920 (N.D. Ill. 2001) ("Expert did not 'identify any concrete

standard upon which a finding of negligence could be based.'" (citing *Butera v. District*

*of Columbia*, 344 U.S. App. D.C. 265, 235 F.3d 637, 660 (D.C. Cir. 2001) (quoting

*District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990)))); *Coll v. Johnson*,

161 Vt. 163, 167, 636 A.2d 336 (1993) (citing *District of Columbia v. Peters*, 527 A.2d

1269, 1273 (D.C. 1987) (expert testimony necessary to establish standard of care in

training officers to deal with mentally disturbed persons or those under influence of

drugs)).[2]

"To establish a national standard of care, an expert must do more than rely on his

own experience."  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 258 (D.D.C. 2018) (quoting

*Butera*, 235 F.3d at 659).  "Rather, the expert 'must refer to commonly used police

procedures, identifying specific standards by which the jury could measure the

defendant's actions.'"  *Id.* (quoting *Butera*, 235 F.3d at 659).  "In so doing, however, the

---

[2] *See also United States v. McDuffie*, No. CR-08-0102-RHW, 2012 WL 1205785 at *3 (E.D. Wash. Apr. 11, 2012) (quoting *Butera*, 235 F.3d at 658-59 (stating that expert testimony on police procedure is confined to "'commonly used police procedures, identifying specific standards by which the jury [can] measure the [officer's] actions'")); *Mittelman v. County of Rockland*, No. 07-cv-6382, 2013 WL 1248623 at *28 (S.D.N.Y. Mar. 26, 2013) (quoting *Butera*, 235 F.3d at 659); *A.B. v. County of San Diego*, No. 18cv1541-MMA-LL, 2020 WL 4431982 at *3 (S.D. Cal. July 31, 2020) (discussing *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 271 (D.D.C. 2018)).

7

No. 97583-3
Madsen, J., dissenting

expert need not 'enumerate the facilities across the country at which that standard is in effect.'" *Id.* (quoting *District of Columbia v. Wilson*, 721 A.2d 591, 599 (D.C. 1998)). In *Sherrod*, the plaintiffs submitted an expert report to establish the standard of care in a police negligence case. *Id.* at 258. The United States District Court for the District of Columbia considered and concluded that the export report met the baseline to establish the applicable standard of care. *Id.* at 259.

Moreover, Washington courts have permitted experts to offer testimony in police negligence actions. In *Donaldson v. City of Seattle*, the Court of Appeals reviewed an action against Seattle alleging police negligence caused the death of a woman resulting from an attack by her boyfriend. 65 Wn. App. 661, 831 P.2d 1098 (1992). The court reviewed an officer's duty to arrest and noted that such a mandatory duty exists if the officer has legal grounds to do so in a domestic violence situation. *Id*. at 670. Relevant to the present case, the *Donaldson* plaintiff proffered an expert who was permitted to testify that in his opinion, the police officer had reasonable grounds to believe a felony had been committed and so had a mandatory duty to arrest. *Id*. Though *Donaldson* did not concern execution of a warrant, it examined police investigation and expert witnesses testified before a jury in the underlying negligence case.

Here, as a threshold matter, Mancini properly presented expert testimony on the appropriate standard of care of professional police officers concerning her assertions of negligent police conduct. However, in my view, that testimony, along with the focus of Mancini's argument at trial, foreclosed Mancini's negligence claim.

8

No. 97583-3
Madsen, J., dissenting

As noted, Mancini presented two theories of negligence at trial: negligent investigation and negligent execution of the search warrant. The majority declines to address the issue of negligent investigation and, instead, focuses on negligent execution of the search warrant. *See* majority at 16, 20. In doing so, the majority acknowledges in a footnote that numerous Washington appellate decisions have "repeatedly denied recovery for negligent police investigation." *Id*. at 15 n.7. I agree that Washington's appellate decisions presently establish that there is generally no common law claim of negligent police investigation in Washington. As Division One of the Court of Appeals correctly observed in *Janaszak v. State*, "We have refused to recognize a cognizable claim for negligent investigation against law enforcement officials and other investigators." 173 Wn. App. 703, 725, 297 P.3d 723 (2013) (citing *Dever v. Fowler*, 63 Wn. App. 35, 44-45, 816 P.2d 1237 (1991); *Fondren v. Klickitat County*, 79 Wn. App. 850, 862-63, 905 P.2d 928 (1995); *Donaldson*, 65 Wn. App. at 671). Division One explained, "Washington common law does not recognize a claim for negligent investigation because of the potential chilling effect such claims would have on investigations." *Id*. (citing *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 702, 222 P.3d 785 (2009)). This court also has acknowledged that negligent investigation claims "do not exist under the common law in Washington." *Ducote*, 167 Wn.2d at 702; *Wrigley v. Dep't of Soc. & Health Servs.*, 195 Wn.2d 65, 76, 455 P.3d 1138 (2020) ("we have not recognized a general tort claim of negligent investigation"); *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 601, 70 P.3d 954 (2003) ("Our courts have not

9

No. 97583-3
Madsen, J., dissenting

recognized a general tort claim for negligent investigation.").  Since negligent

investigation does not exist at common law in Washington and the majority does not

advocate for such a cause of action, any claim by Mancini so asserting should have been

dismissed as a matter of law.  The Court of Appeals was correct on this issue.

I also disagree with the majority that substantial evidence supports Mancini's

claim that police negligently executed the search warrant at her apartment.  As noted

above, Mancini's own expert testified that Tacoma police properly executed the entry of

Mancini's apartment and appropriately took control of the premises pursuant to the

warrant, and that none of the police contacts with Mancini were contrary to established

practices and procedures or were improper.  Mancini, in her rebuttal during closing

argument, appears to concede as much, stating,

> And they [(Tacoma police)] talk about their policies and procedures and
> how they were followed.  Their policies and procedures are to hit that door,
> and go in, and move very rapidly, and detain and subdue any occupant.
> And the way they do it is they get them down on the floor, and they
> handcuff them behind the back at gunpoint.  *So, yeah, they followed their*
> *policies and procedures*."

7 VTP at 802 (emphasis added).  Nevertheless, Mancini's counsel asked the jury to "fully

compensate" Mancini because the Tacoma Police Department "didn't take the time to do

their job."  *Id*. at 807.  In other words, Mancini asked the jury to find in her favor because

police, in any event, had failed to properly investigate.[3]

---

[3] The focus of Mancini's closing argument was the police department's alleged dilatory
investigation that led to the issuance of the search warrant.  Mancini's counsel explained, "There
was negligence.  There was negligence in obtaining the warrant in the first place.  We're all
supposed to do our homework, but they [(police)] didn't."  7 VTP at 746.  Counsel repeated this
core theme throughout closing argument.  "Let's back up and look at what they did and didn't do

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 97583-3
Madsen, J., dissenting

While I would recognize a common law claim for negligent police investigation, the fact remains that it does not currently exist in Washington. Given Mancini's own expert's testimony, along with Mancini's concession in closing arguments, that police acted appropriately in securing the scene and in their contacts with Mancini in executing the warrant, in my view there is no basis for Mancini's negligence claim. As previously explained, any claim of negligent investigation fails as a matter of law and any claim of negligence based on the execution of the warrant fails as a matter of fact. Accordingly, the Court of Appeals correctly held that the trial court erred in denying the city's motion for judgment as a matter of law. On these bases, I would affirm the Court of Appeals.

Madsen, J.

Madsen, J.

---

because there's been testimony from the police involved in this raid that they did surveillance on 95 percent of their cases. 95 percent. They didn't do it in this case." *Id*. at 727. "[T]hey [(Tacoma police)] didn't do any surveillance. They didn't bother. They just wanted to put on their SWAT [(special weapons and tactics)] gear and go, and that's essentially what they did." *Id*. at 731. "Their idea of an investigation is to put someone who is on drugs . . . in a van and drive her through the parking lot of a complex that had four identical buildings. And she just points to . . . an apartment and says, 'That's it.' And that was pretty much the extent of their investigation." *Id*. at 727-28. Counsel further argued, "There were dozens of ways that [police] could have checked their information. They didn't bother." *Id*. at 734. "You also heard from Chief Stamper that you do controlled buys." *Id*. at 727. Counsel reiterated, "Nobody's got a problem with [using a drug informant]. But even their own procedure says that information from an informant should be checked for accuracy, and that's what didn't happen here because accuracy is not driving an informant to a parking lot with four identical buildings and saying, 'Hey, point to the one where the drugs are,' because that's what they did. That was their investigation." *Id*. at 736-37.

11